994 So.2d 508 (2008)
Neal SHNIDERMAN, Appellant,
v.
FITNESS INNOVATIONS AND TECHNOLOGIES, INC., and DTR Associates Limited Partnership, Appellees.
No. 4D07-3340.
District Court of Appeal of Florida, Fourth District.
November 19, 2008.
*509 David P. Ackerman and Glory P. Ross of Ackerman, Link & Sartory, P.A., West Palm Beach, and Jack S. Cox of Jack Schramm Cox, P.A., Hobe Sound, for appellant.
Philip M. Burlington of Burlington & Rockenbach, P.A., and Louis M. Silber of Silber, Valente & Davis, P.A., West Palm Beach, for Appellee-Fitness Innovations and Technologies, Inc.
GROSS, J.
Attorney Neal Shniderman appeals the final judgment for attorneys' fees entered against him and in favor of his former client for a portion of the sanctions assessed against the client for bad faith litigation conduct. We affirm that portion of the judgment representing the fees incurred by the injured party as a result of Shniderman's actions; this portion of the judgment was within the inherent power of the court to sanction attorneys for bad faith litigation conduct. We reverse that portion of the award compensating Shniderman's former client for the attorney's fees incurred in pursuing Shniderman to recover a portion of the sanction.
Fitness Innovations & Technologies, Inc. was the plaintiff in the circuit court. In January 2003, the law firm of Winderweedle, Haines, Ward and Woodman filed a verified complaint seeking to foreclose on *510 three properties and to recover on a promissory note and guaranty. Four exhibits accompanied the complaint; pertinent to this appeal, one exhibit was an unsigned non-recourse guaranty with signature lines for Victor Grillo, Jr. and Stacey Grillo, attached as Exhibit C to the complaint. As security, this guaranty listed second mortgages on real property in Massachusetts and Boca Raton, Florida. The complaint alleged that Fitness "owns and holds the Note, Guaranties and Mortgage." Fitness's president, David Augustine, verified the allegations of the complaint.
In their answer and affirmative defenses, the Grillo defendants contended that Exhibit C was invalid, in that it was unsigned and referenced properties other than those listed in a legitimate mortgage and security agreement. Augustine later acknowledged that the answer prompted Fitness to search for the executed guaranty, because he realized that Exhibit C was not the appropriate document.
In a June 2003 memo, Augustine said he could not find an executed copy of Exhibit C. He wrote to an attorney at the Winderweedle law firm asking about the missing document. The attorney responded that the firm had never been provided with an executed copy of Exhibit C.
Shniderman began to represent Fitness on August 28, 2003, approximately eight months after the complaint was filed. On that date, Augustine discussed the operative documents in an email to Shniderman, including "the Non-Recourse Guaranty (unsigned by Grillo, Jr. and wife)". On August 30, 2003  acknowledging that an executed non-recourse guaranty was absent or missing  Shniderman emailed Augustine and Alan Morelli, a co-owner of Fitness:
We may have or want to argue for a "missing guaranty" as opposed to a never executed guaranty, which under Florida law might be capable of being recreated/re-established.
Shniderman ended the email by stating: "How this all pieces together is very much unclear but may be at the heart of your ability to pursue the non-recourse guarantors." Thus, shortly after his engagement, Shniderman was aware that Fitness did not have an executed copy of Exhibit C.
Also, in the August 30, 2003 email, Augustine advised Shniderman, that "the Mass. Property was never encumbered at all, because by the time we entered into these security agreements (almost 1 year after the settlement agreement was signed), DTR had paid down the note by around $1m. so we agreed to forgo this final piece of collateral." Later, Grillo, Jr. testified at his deposition, taken by Shniderman, that he had refused to allow his Massachusetts home to be used as security. Thus, the true state of affairs, that the Massachusetts property was not encumbered, was contrary to the terms of Exhibit C.
In January 2004, Morelli sent Shniderman an email admitting that Fitness had failed to obtain signatures on Exhibit C. He wrote, "If we can commence an action to compel the execution of the non-recourse guaranty, it should be done on a concurrent basis." Later that month, Augustine emailed Shniderman, stating: "Alan [Morelli] and I spent the weekend going over the issue regarding our failure to obtain Grillo Jr.'s signature on the guaranty for the FL condo."
In February, 2004, Shniderman moved to strike the defendants' answer on the ground that the Grillos had signed "patently false pleadings." The motion to strike was supported by Augustine's affidavit. As noted by Judge Fine in his sanction order:

*511 [T]he affidavit filed by Mr. Shniderman and signed by Mr. Augustine ... re-asserted under oath that attached to the affidavit is a copy of the Non-Recourse Guaranty without ever saying that they were not in possession of an executed guaranty. The testimony at the evidentiary hearing was that the language in the affidavit was deliberately chosen to steer around revealing that they were not in possession of an executed Guaranty.
In July 2004, Judge Wessell granted Fitness' motion to strike the defendants' answer and affirmative defenses as a sham pleading. The allegations of the complaint were deemed admitted and the trial court reserved jurisdiction to enter a final judgment. Prepared for the judge's signature by Shniderman, the order stated that "[t]he liability of each of the Grillo defendants is clear and unconditional under the note, mortgage, and guaranties." By this order, Fitness had secured an entitlement to relief based, in part, upon a document which its principals and attorney knew did not exist.
After their answer was stricken, Stacey and Victor Grillo, Jr. hired attorney Louis Silber. He reviewed the file and noticed that Exhibit C was not executed. He called Shniderman and requested an executed copy of that document. Shniderman refused, saying that the document was irrelevant. In August 2004, Silber sought a continuance of the final hearing and filed a request to produce two items: a copy of the executed non-recourse guaranty and a copy of the signature page of the verified complaint. This was the defendants' first request to Fitness to produce a signed copy of Exhibit C.
The request to produce generated a series of emails between Shniderman and his clients. Shniderman's "inclination" was to object to the document request. The clients expressed concern about having the judge "think we are being evasive." In an August 26 e-mail, Shniderman counseled his clients:
Where I am mulling is how to "break the news" to Silber. There are several approaches and I need to flesh them out for myself and then see what you ... think ... this is a critical time ... I want to keep the Genie in the bottle.
Augustine understood that the "genie in the bottle" and the "news" his lawyer referred to was the fact that Fitness did not possess an executed non-recourse guaranty as had been alleged in the verified complaint.
Consistent with his inclination, Shniderman filed an objection to the request to produce, arguing that it was irrelevant and immaterial in light of the trial court's ruling on liability. As a second ground, the objection stated:
Victor Grillo, Jr. and Stacey Grillo previously acknowledged that they executed the document in question, and they can obtain a copy from their former counsel. Thus, the document being sought is equally available to the Defendants as [it is] to the Plaintiffs. The request is really nothing more than an effort to harass the Plaintiff.
Shniderman admitted that when he raised that objection, he knew that his clients were unable to produce an executed copy of Exhibit C. He testified:
Q. And you, you were not going to advise the parties that you could not produce that document?
A. Right. I was going to let the matter  I was going to object and let matters come to a head in front of the court and the court could make whatever decision it wanted to make.
E-mails from September 2004 between Shniderman and his clients discussed various *512 ways of handling the absence of the signed guaranty. It was the clients who suggested that they should be "up front" with the court, but Shniderman resisted full disclosure. At the hearing on the motion to compel, Shniderman said nothing about the true state of affairs and the circuit court overruled Fitness' objections to the request to produce and ordered it to produce the executed copy of Exhibit C within 30 days.
After the order to produce, Shniderman and his clients decided to say that the signed guaranty had once existed, but that "it now appears to be missing." Thus, in his notice of compliance filed in November 2004, Shniderman wrote that Fitness previously possessed, but misplaced, the non-recourse guaranty, so that it could not now produce a copy. He further stated that Fitness "personnel know that the Guaranty actually was executed, have searched and continue to search for another copy of the executed document," and that "[a]lthough FIT does not appear to have retained a copy of the Guaranty, it has reason to believe that the executed document is presently in the hands of person(s) and/or entities not within the control of the plaintiff, including the defendants." David Augustine approved this statement before Shniderman filed it.
In early December 2004, Augustine told Shniderman that the unexecuted Exhibit C was not the final form of the guaranty that had been prepared. Shniderman discussed this subject in an e-mail to his clients:
Recently, David [Augustine] told me the last version of the non-recourse guaranty provides for two and not three signatures, which is the version attached to the complaint, so we have an additional issue to resolve and David will have to deal with that in his deposition. One of you will have to identify the actual last version of the document so we can compare it to the exhibit. Amending the complaint would correct the problem but that would be a big issue as it would permit them to amend but more to the point, procedurally, the Grillo defendants are "out" with stricken pleadings.
When confronted with this e-mail at the sanctions hearing, Shniderman admitted that at the time he composed it, he knew that the verified complaint contained false allegations and that his notice of compliance contained false information. Shniderman did not advise the court of this fact or seek to amend the complaint "because [he] was not sure exactly what [he] needed to do," and because he did not want to see the motion to strike "unravel," i.e., allow the defendants be relieved of the default judgment.
Before his deposition by Grillo, Jr.'s counsel, Augustine asked Shniderman in an email: "What are we telling him as a result of this? That we're not producing any docs at the depo?" Shniderman responded:
We close it by saying we will not produce and that we will file a motion for protective order. The burden is on us at this point to move for protective order arguing we need not produce in any event based on Wessel's order and lack of relevancy AND out of time. [capitalization in original]
Augustine responded:
I hate the idea of us seeming to trying to "hide" something again  we lost on 10/20 on this same issue  do we want to go before J. Fine, for the VERY FIRST TIME, with a motion for Protective Order to avoid producing docs? [capitalization in original]
In February 2005, Shniderman withdrew as counsel for Fitness.
*513 In April 2005, the defendants moved for the court to impose sanctions and for other relief. The motion sought sanctions against both Fitness and Shniderman, alleging in part that counsel had a duty to come forward and inform the court that the verified complaint included false allegations. The motion also alleged that counsel knowingly filed objections to producing a non-existent document, representing that the document was "misplaced" and that Fitness was continuing to search for it.
Judge Fine held two evidentiary hearings on sanctions, which Shniderman attended with counsel. The Grillo defendants took the position that Fitness' misconduct was so egregious that it justified dismissal of the complaint, in addition to other sanctions such as attorney's fees. Fitness' new lawyer conceded that the company committed errors, but argued that dismissal was too extreme a sanction.
At the close of the evidence at the first hearing on June 2, 2005, Shniderman moved the court to defer ruling on the motion as it applied to him, requesting the right to present evidence at a later date if necessary. Judge Fine granted the motion, ordering that Shniderman would have a chance to present additional evidence before the imposition of any sanctions against him.
After taking the matter under advisement, Judge Fine entered an order in July 2005, finding that Fitness "exhibited a willful and deliberate obstruction of the discovery process which resulted in excessive litigation." The court found that Fitness had used improper, obstructionist tactics for two years before admitting that it did not have a signed version of Exhibit C. The court indicated that it did not know whether Shniderman willfully participated in the obstruction. Although the court did not enter the ultimate sanction of dismissing the complaint, it ordered that the defendants recover all attorney's fees and costs incurred in their litigation efforts relating to Exhibit C.
After a hearing regarding the amount of attorney's fees incurred by the Grillo defendants, Judge Fine entered a final judgment against Fitness for $140,097.62, which, the court observed, did "not include future fees and costs." The judgment outlined the future proceedings that were contemplated, including an in camera inspection of certain documents to determine the level and extent of Shniderman's involvement in the improper litigation conduct.
Once the judge ruled that Shniderman could be questioned about certain documents at his deposition, Fitness and the defendants entered into a settlement agreement, under which Fitness satisfied the $140,097.62 final judgment. The settlement contemplated that Shniderman be pursued "for recovery of any part of attorneys fees adjudged against [Fitness] in favor of [the defendants] as a sanction for discovery abuses."
With the defendants now out of the sanctions case, Fitness moved to apportion the award of attorney's fees and costs; it contended that the sanctions award resulted from Shniderman's representation and bad advice.
Shniderman responded with a procedural motion; he moved to strike the motion to apportion. He argued that since he was not a party to the underlying lawsuit, due process required that he be served with a complaint. He argued that the relief sought by Fitness was not provided for in the rules of civil procedure, Florida statutes, or common law. He wanted a jury trial. Judge Fine denied the motion to strike.
*514 The sanctions hearing recommenced on January 4, 2007. Shniderman, Augustine, and Morelli testified and the court reviewed e-mails and other exhibits.
In February 2007, the trial court entered an eight page order assessing sanctions against Shniderman. The court wrote that the verified complaint had alleged that Exhibit C was executed by the Grillos and was in Fitness's possession, but that "[t]oday, all parties agree that neither of these allegations are the actual facts." The court criticized Shniderman for not making it clear that, while objecting to the production of a copy of the executed guaranty, his client had yet to find a signed version of it:
There was no reason why he [Shniderman] could not have made his same argument and at the same time have disclosed that his side of the case did not actually have a signed copy to present to Mr. Silber [defendants' attorney] or the Court. Mr. Shniderman could have made all of his arguments concerning his key case, .... His candor would have prevented the long road that led to the delay and expense incurred in merely finding out the answer to Mr. Silber's request....
The order cited instances of misconduct on Shniderman's part, including convincing the trial court to strike the defendants' pleadings at a time when he knew the verified complaint contained false assertions; arguing and objecting to the production of the document when he knew his client was unable to produce it; and intentionally engaging in conduct to mislead opposing counsel and the court regarding whether such a guaranty actually existed.
The order referenced several of the trial exhibits, including the following:
 Shniderman's statement: "I want to keep the Genie in the bottle";
 The emails from Morelli and Augustine in which they expressed concern about being evasive and advocated being candid with the court, but Shniderman chose "to hide the fact that they had no signed copy of the document in question and specifically not to allow attorney Silber to know this"; and
 Shniderman's e-mail to his clients, authored after he admitted he knew there was, in fact, no executed non-recourse guaranty, wherein he advised them not to produce any documents at Augustine's deposition, but to file a motion for protective order.
Ultimately the court concluded that the liability for fees and costs should be apportioned 60% to Shniderman and 40% to Fitness.
Following a hearing on the amount of additional attorney's fees, the trial court entered a final judgment against Shniderman, in which it ordered that Fitness recover from Shniderman 60% of the original sanction award/attorney's fees judgment entered in favor of defendants ($84,058.57) and 60% of the attorney's fees and costs Fitness spent in pursuing recovery against Shniderman ($124,869.25), for a total judgment of $208,927.82.
A trial judge's decision to impose sanctions against an attorney for bad faith litigation conduct is reviewed under an abuse of discretion standard. See Gold v. Rodriguez, 914 So.2d 528 (Fla. 4th DCA 2005). The Supreme Court has written that this deferential standard of appellate review is appropriate because the trial judge "sees the parties first-hand and is more fully informed of the situation" regarding a noncompliance with procedural rules. Mercer v. Raine, 443 So.2d 944, 945 (Fla.1983) (quoting Farish v. Lum's, Inc., 267 So.2d 325, 327 (Fla.1972)).
*515 Moakley v. Smallwood, 826 So.2d 221 (Fla.2002), and Patsy v. Patsy, 666 So.2d 1045 (Fla. 4th DCA 1996) are the leading cases addressing a trial court's inherent authority to impose attorney's fees against a lawyer for litigating in bad faith. See also David S. Nunes, P.A. v. Ferguson Enters., Inc., 703 So.2d 491 (Fla. 4th DCA 1997); Sanchez v. Sanchez, 435 So.2d 347 (Fla. 3d DCA 1983). In Moakley, the supreme court held that "a trial court possesses the inherent authority to impose attorneys' fees against an attorney for bad faith conduct," which, like the power of contempt, "carries with it the obligation of restrained use and due process." 826 So.2d at 226-27. Moakley cited Patsy with approval, as a case where this court recognized that a court must "sparingly and cautiously exercise" this inherent authority to award attorney's fees against an attorney. Id. at 225.
In Moakley, the Supreme Court established five guidelines to evaluate a court's exercise of its inherent authority to assess fees against a lawyer for bad faith litigation conduct. First, the assessment of fees as a sanction "must be based upon an express finding of bad faith conduct." Id. at 227. Second, this finding "must be supported by detailed factual findings describing the specific acts of bad faith conduct that resulted in the unnecessary incurrence of attorneys' fees." Id. Third, the amount of attorneys' fees awarded "must be directly related to the attorneys' fees and costs that the opposing party has incurred as a result of the specific bad faith conduct of the attorney." Id. Fourth, the sanction "is appropriate only after notice and an opportunity to be heardincluding the opportunity to present witnesses and other evidence." Id. Fifth, "if a specific statute or rule applies, the trial court should rely on the applicable rule or statute rather than on inherent authority." Id.
The trial court's order satisfied the Moakley standards. The court's detailed factual findings demonstrate that Shniderman engaged in two years of bad faith litigation. The emails admitted into evidence provide a factual basis for the trial court's rejection of the claim that Shniderman relied on the representations of his client. The evidence demonstrated that Shniderman knew that Exhibit C had never been executed and that Fitness did not possess an executed copy. Nevertheless, he obtained a default premised upon the inaccurate verified complaint, prepared an order setting the stage for recovery based on the non-existent guaranty, and engaged in discovery misconduct to avoid acknowledging the truth about Exhibit C to preserve the default against the Grillo defendants.
Judge Fine's detailed factual findings are sufficient under Moakley  he specifically found that Shniderman engaged in bad faith conduct and entered a detailed, eight page order describing the specific acts.[1] The trial court's order is in stark *516 contrast to orders that we have found deficient under Moakley. See, e.g., Finol v. Finol, 912 So.2d 627 (Fla. 4th DCA 2005).
Shniderman had ample notice and an opportunity to be heard before the trial court imposed the sanctions. The Grillo defendants' motion to strike and for sanctions sought relief against Shniderman as counsel for Fitness. Shniderman attended the June 2, 2005 hearing with counsel and secured a deferral of the trial court's ruling as to any sanctions against him. Shniderman had a full opportunity to present witnesses and evidence in his defense at the January 4, 2007 hearing.
With the benefit of hindsight, Shniderman attempts to spin his conduct in a way that minimizes his culpability. He claims that the non-recourse guaranty was "not really necessary" to the relief sought by Fitness, and was "surplusage." He explains that his client sought to foreclose on property in Palm Beach County, which was pledged as collateral under a fully executed mortgage and security agreement. There was no dispute below, he contends, that all defendants signed the mortgage and security agreement pledging this property, and it was these documents, he emphasizes, that were the focus of the case.
This reshaping of history does not undermine the trial court's order. The way that Shniderman conducted the litigation demonstrates that Exhibit C played a role in his litigation strategy. The order drafted for Judge Wessell left open the possibility that judgment could be entered on the guaranty. Shniderman's efforts to hide the truth about Exhibit C, over a period of years, undercut his claim that the document was immaterial to his vision of the case. Exhibit C was an exhibit to the complaint upon which a default had been entered. The defendants were entitled to have Fitness produce it. The discovery sought would have provided a basis for setting aside the default.
We also reject Shniderman's procedural complaints about allowing Fitness to recover directly from him in this case. The trial judge was authorized to assess fees against him under Moakley; as part of his authority, the judge could properly allocate responsibility between Shniderman and his clients. In a different, but similar context, such authority to apportion expenses *517 between responsible "parties and persons" is allowed by Florida Rule of Civil Procedure 1.380(a)(4), which applies to expenses resulting from a motion to compel discovery.[2] Shniderman requested a bifurcated hearing, that the court defer ruling as to him, so he cannot complain on appeal that this procedure worked to his detriment. The Grillo defendants' settlement with Fitness, and the resulting assignment of claims, did not require the filing of a separate contribution complaint for the court to determine Shniderman's financial responsibility; the settlement did not alter the court's inherent authority to confront bad faith litigation tactics under Moakley principles.
We find one error in the trial court's assessment of the amount of attorney's fees. Although the court was authorized to hold Shniderman responsible for $84,058.57 in fees, the court was not permitted under Moakley to require that Shniderman also be responsible for 60% of the fees and costs ($124,869.25) which Fitness, his former client, expended in pursuing recovery against Shniderman.
Under Moakley, the ability of a trial court to use its inherent authority to impose attorneys' fees against an attorney is not a power that is to be loosely invoked. A freewheeling exercise of the power might deter the pursuit of lawful claims, issues, or defenses or stifle zealous representation of clients. 826 So.2d at 226. We therefore read the five Moakley guidelines as limitations on the trial court's authority. The underlying assumption of the Moakley/Patsy line of cases is that the injured party, the innocent party, will be compensated for its loss. The party injured by bad faith litigation misconduct is the opposing party in the lawsuit, the party victimized by the perpetrators' misconduct. Thus, Moakley mandates that the amount of an attorneys' fee award must be "directly related" to those fees and costs "that the opposing party has incurred as a result of the specific bad faith conduct of the attorney." Id. at 227 (emphasis supplied).
Here, Fitness was not the "opposing party" injured by litigation misconduct. It was one of the wrongdoers. After it paid the judgment against it, Fitness was able to stand in the defendants' shoes and try and shift some of its loss to Shniderman; but, as an active wrongdoer, and not the victimized "opposing party," Fitness was not able to recover attorneys' fees under Moakley for its efforts.
We affirm the award of $84,058.57 and the taxable costs assessed in the trial court's August 8, 2007 judgment. We reverse the award of attorney's fees assessed against Shniderman for time spent between March 17, 2006 to August 6, 2007.
Affirmed in part, reversed in part, and remanded.
WARNER and DAMOORGIAN, JJ., concur.
NOTES
[1] For example, these excerpts of the trial court's order demonstrate that degree of specificity of a trial court's order required under Moakley:

The dilatory and vexatious practices utilized by Plaintiff reflect a belief that the truth could be hidden by utilizing the legal system's discovery procedures to hedge having to admit that the plaintiff lacked a signed guaranty. The tactics were designed to make the ability to discover whether or not the plaintiff possessed a signed copy of this document so expensive, so time-consuming, and so slow, that the truth would not be discovered before a final judgment of foreclosure was signed by the Court. The tactics utilized were unconscionable and constitute fraud on the Court.
. . .
Mr. Shniderman convinced Judge Wessel to default the Grillos and strike their pleadings. At the time Mr. Shniderman was aware of the fact that the verification in his client's complaint was inaccurate....
As the attorney responsible for his client's representations to the Courts, the attorney's conduct in this case undermined the truth-finding process, by pursuing a course of action designed to creat a false impression with the Court that could have easily resulted in a final judgment in favor of Plaintiff based upon a non-existent guaranty. For example, the affidavit filed by Mr. Shniderman and signed by Mr. Augustine on February 12, 2004, re-asserted under oath that attached to the affidavit is a copy of the Non-Recourse Guaranty without ever saying that they were not in possession of an executed guaranty. The testimony at the evidentiary hearing was that the language in the affidavit was deliberately chosen to steer around revealing that they were not in possession of an executed Guaranty. Mr. Augustine wrote the first draft and Mr. Shniderman assisted in, approved of, and submitted the final version.
... The legal advice by Mr. Shniderman to the corporate attorneys and his pleadings and arguments to the Court encouraged, implemented, and advanced a plan to improperly thwart disclosure of the true facts. This conduct constitutes bad faith in litigation and a fraud upon the Court.... The Court finds that the facts demonstrating the misconduct, including fraud on the Court, have been proven by clear and convincing evidence.
[2] We note that Rule 1.380(a)(4) did not control this proceeding, since the misconduct at issue was broader than a failure to make discovery.